# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

FILMON MEHTSENTU,        )
)
      Movant,        )
)
v.                  )     **Case No. 3:21-cv-00417**
)     **Judge Aleta A. Trauger**
UNITED STATES OF AMERICA,   )
)
      Respondent.      )

### MEMORANDUM

Before the court is movant Filmon Mehtsentu's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (Doc. No. 1), challenging the judgment and sentence imposed upon him in the underlying criminal case. *See United States v. Mehtsentu et al.*, No. 3:17-cr-00220, Judgment (Doc. No. 743) (M.D. Tenn. July 15, 2019).[1] The motion is supported by a Memorandum of Law (Doc. No. 2) and Mehtsentu's Affidavit (Doc. No. 2-1). The government filed a Response in Opposition to the motion (Doc. No. 20), accompanied by the Affidavit of David I. Komisar, Mehtsentu's former attorney (Doc. No. 20-1 ("Komisar Aff.")).[2] For the reasons set forth herein, the motion will be denied.

## I.    PROCEDURAL BACKGROUND

In November 2018, Mehtsentu and others were charged in a Second Superseding Indictment[3] with conspiracy to knowingly distribute and to possess with intent to distribute heroin,

---

[1] References to the criminal case record will hereafter be designated as "Crim. Doc. No. __."

[2] The court also granted the government's Motion for an Order Finding That Petitioner Has Waived the Attorney-Client Privilege. (Doc. Nos. 14, 18.)

[3] Mehtsentu was also named in the original and First Superseding Indictment, filed in

fentanyl, and methamphetamine. (Crim. Doc. No. 405.) Shortly thereafter, the government filed an Information Alleging One Prior Conviction ("851 Notice"), under 21 U.S.C. §§ 841(b) and 851(a)(1), establishing that Mehtsentu had previously been convicted of a felony drug offense. (Crim. Doc. No. 457.)

Mehtsentu eventually agreed to plead guilty to the single count in the Second Superseding Indictment pursuant to a plea agreement governed by Federal Rule of Criminal Procedure 11(c)(1)(B). (*See* Petition to Enter a Plea of Guilty ("Plea Petition") and attached Plea Agreement, Crim. Doc. No. 522.) Because the government had filed the 851 Notice, Mehtsentu agreed, as part of the Plea Agreement, that he faced a mandatory minimum prison sentence of twenty years. (*See* Crim. Doc. No. 522, at 1, 8–9.) However, during the period of time between the change of plea hearing, on December 18, 2018, and sentencing, on July 12, 2019, Congress passed the First Step Act ("FSA"). Consequently, prior to sentencing, the government filed (and the court granted) a motion to withdraw the 851 Notice (Crim. Doc. Nos.726, 733), which ultimately resulted in a reduction of Mehtsentu's minimum mandatory sentence from twenty years to ten years. (Sentencing Hr'g Tr., Crim. Doc. No. 778, at 4, 5.)

In the Plea Agreement, Mehtsentu expressly agreed to plead guilty because "he is in fact guilty of the charge contained in Count One of the second superseding indictment," and he admitted the facts enumerated in the Plea Agreement. (Crim. Doc. No. 522, Plea Agreement ¶ 9.) With respect to his offense-level calculation, Mehtsentu also agreed that his base offense level was 34, based on U.S.S.G. § 2D1.1(c)(3) and the quantity of drugs for which he was responsible. The parties agreed on a recommended final offense level of 39, which took into account agreed-upon enhancements for possession of a dangerous weapon, making a credible threat to use violence, and

---

November and December 2017. (Crim. Doc. Nos. 3, 119.)

being an organizer/leader of criminal activity involving five or more participants. (*Id.* ¶ 11.)

At the change of plea hearing, the court placed Mehtsentu under oath, instructed him as to what that meant, and confirmed his understanding of the charge against him. (Crim. Doc. No. 777, at 2, 4–5.) Mehtsentu also affirmed under oath in open court that he understood the charges, that he had told his attorney, David Komisar, "everything [he knew] about the facts that support this charge," that Komisar had told Mehtsentu "what the government would have to prove for [him] to be found guilty of this charge," that they had discussed "any possible defenses [Mehtsentu] might have," that Komisar had "done all the investigation [Mehtsentu had] asked him to do," and that Mehtsentu, based on what he knew at that time anyway, was "satisfied with his representation . . . so far." (*Id.* at 5–6.)

After the court explained the penalties Mehtsentu was facing and how pleading guilty to a felony would affect his civil rights, specifically including the rights he was waiving by pleading guilty rather than going to trial, Mehtsentu confirmed that he had read the Plea Petition and the Plea Agreement and that he understood them. (*Id.* at 6–8.) The court nonetheless went over in some detail the terms of the Plea Agreement and made sure that Mehtsentu understood that he was admitting the truth of the facts set forth in the Plea Agreement and agreeing that those facts proved his guilt beyond a reasonable doubt. (*Id.* at 8–9.) The court specifically pointed out that Mehtsentu had agreed as part of the Plea Agreement that he did not "qualify for what we call the safety valve under the guidelines," so "the only other way to get around the minimum 20-year sentence [in effect at that time] is to cooperate," and he had chosen not to do that. (*Id.* at 10; *see also* Crim. Doc. No. 522, at 16 (stating that the defendant was not entitled to relief under the safety valve, "because of his criminal history and his possession of a firearm" (citing 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2(a)(5))).)

Counsel for Mehtsentu at that point noted that, although the government's position was that the information Mehtsentu had provided "was not worthy of a downward departure," "certainly the defense position [was] that he had cooperated and cooperated early." (*Id.* at 11.) But, as the court explained, the court could not give the defendant credit for cooperation and go below the mandatory minimum unless the government filed a motion. Defense counsel acknowledged as much but reiterated his position that Mehtsentu had cooperated. (*See id.* at 11–12 ("I understand that, and so does Mr. Mehtsentu. It's been thoroughly explained to him as to – he's stuck with that 20-year mandatory minimum, no matter what. . . . [B]ut I don't think it's a true statement to say that he has not cooperated.").) The court reminded Mehtsentu that, despite this disagreement, by pleading guilty, he and the government had agreed to recommend a final offense level of 39, that the court was not bound by this recommendation, and that Mehtsentu would not be permitted to withdraw his guilty plea even if the guideline calculation and the final offense level turned out to be different from what the parties recommended. (*Id.* at 12–13.)

During the plea colloquy, Mehtsentu confirmed that no one had "promised or suggested to [him] what sentence [the court would] give [him] in order to get [him] to plead guilty," that no one had "put any kind of pressure on [him], psychological or physical, to get [him] to plead guilty," that he understood the shortest sentence he could receive was 20 years, and that he was "certain this [was] what [he wanted] to do." (*Id.* at 17.) Nonetheless, because Mehtsentu also indicated that he was experiencing some psychological distress at that time and desired mental health counseling, the court directed defense counsel to file a motion to obtain a mental health evaluation for his client, and the court deferred acceptance of the plea, "so if we find something that causes some concern, he'll be able to more easily withdraw his guilty plea." (*Id.* at 19.)

The government then presented a summary of the facts that it believed it could prove beyond a reasonable doubt if the case went to trial. (*Id.* at 19–24.) Mehtsentu confirmed that the prosecutor had accurately informed the court of his role in the drug-distribution conspiracy. (*Id.* at 25.) The court then went through each of the elements that the government would have to prove for Mehtsentu to be found guilty of the charge. (*Id.*) Mehtsentu agreed that the government could have proved those elements if the case had gone to trial. He pleaded guilty, and he confirmed that he was pleading guilty because he was, in fact, guilty. (*Id.* at 25–26.)

At the conclusion of the hearing, the court found that there was a factual basis for the plea and that Mehtsentu was in full possession of his faculties and competent to plead guilty, understood the nature of the charges against him and the mandatory minimum and maximum penalties provided by law, and had voluntarily offered to plead guilty. The court reserved acceptance of the plea and set a sentencing date. (*Id.* at 26.)

The probation office prepared a Presentence Investigation Report ("PSR"), making a number of recommendations regarding Mehtsentu's sentence. Notably, the PSR determined that the defendant was in Criminal History Category VI. (Crim. Doc. No. 756, PSR ¶ 48.) The PSR determined that the total offense level was 39, consistent with the parties' recommendation in the Plea Agreement. (*Id.* ¶ 37.) This yielded a guideline range of 360 months to life. (*Id.* ¶ 84.)

The sentencing hearing was conducted on July 12, 2019. Mehtsentu confirmed that he had read the PSR, and the court addressed the defendant's objections to it, while noting that none of them had "any effect on the sentencing range." (Crim. Doc. No. 778, at 3.) Specifically, the court overruled the defendant's objections to (1) the two points added for "credible threat of harm," to which Mehtsentu had agreed in the Plea Agreement and (2) the three points added in ¶ 43 of the PSR under U.S.S.G. § 4A1.1(a). With regard to the defendant's objection to the assignment of two

points under U.S.S.G. § 4A1.1(d) in ¶ 47, the court noted that those two points had been removed by a supplement to the PSR dated July 10, 2019 but that Mehtsentu remained in Criminal History Category VI, even with the removal of those two points. The court also noted that the government had withdrawn the 851 Notice (Crim. Doc. No. 778, at 4.)

The court then accepted the PSR as the court's findings of fact on all sentencing issues and on the application of the guidelines, meaning that the court found that Mehtsentu's offense level was 39, his Criminal History Category was VI, and the resulting guideline range was 360 months to life, with a mandatory minimum sentence of ten years and five years of supervised release. (*Id.* at 4–5.) After hearing vigorous argument from the government, requesting 300 months, and from defense counsel, requesting a 144-month sentence in line with that of one of Mehtsentu's co-defendants, Guled Mohammed, the court ultimately sentenced Mehtsentu to 240 months—120 months below the bottom of the advisory Guideline range, but 120 months above the minimum mandatory sentence. (*Id.* at 58.) The court noted Mehtsentu's cooperation as factoring into the sentence. (*Id.* at 59.)

Mehtsentu appealed his sentence as both procedurally and substantively unreasonable under 18 U.S.C. § 3553, but the Sixth Circuit granted the government's motion to dismiss the appeal, on the basis of the appellate-waiver provision in the Plea Agreement and the fact that the sentence was "within the terms of his valid appeal waiver." (Crim. Doc. No. 841, at 4.)

On May 25, 2021, after the dismissal of his direct appeal and well within the one-year statute of limitations, Mehtsentu, through counsel, filed the present § 2255 motion. (Doc. No. 1.) The motion raises a single claim of ineffective assistance of trial counsel, based on allegations that Mehtsentu's trial attorney was constitutionally ineffective in counseling him regarding his plea and at sentencing. (*Id.* at 5.) Although the Memorandum of Law in support of the § 2255 motion

is rambling and disorganized, the court construes it as alleging ineffective assistance of counsel at the plea stage, rendering Mehtsentu's plea involuntary, insofar as counsel allegedly (1) failed to provide Mehtsentu copies of all of the discovery produced by the government; (2) failed to fully explain the charges against Mehtsentu and the potential sentence; and (3) failed to ensure that Mehtsentu understood what was happening and that his plea was knowing and voluntary. Mehtsentu also claims that his counsel was constitutionally ineffective at the sentencing stage, as he allegedly failed to advise him correctly regarding the effect of cooperating with the government and failed to object to sentence enhancements in the PSR. (Doc. No. 2, *passim*; *see also* Doc. No. 2-1, May 7, 2021 Affidavit of Filmon Mehtsentu ("Mehtsentu Aff."), *passim*.)

Mehtsentu argues that counsel's purported failures cannot be attributed to strategy, as counsel "chose simply to placate his client and let both the errors in the PSR and Mehtsentu's involuntary plea stand unquestioned." (*Id.* at 15.) He indicates that he suffered prejudice as a result of counsel's errors, insofar as the errors denied Mehtsentu a reasonable sentence reduction and left him no opportunity to challenge sentencing errors on appeal. (*Id.* at 15.)

In the alternative, Mehtsentu argues that, if the court finds that counsel's performance was deficient but his errors were not the "but for cause of the prejudice described above," then the court should find that the "gravity of counsel's deficient performance in this case amounts to a deprivation of counsel altogether, giving rise to a presumption of prejudice." (*Id.* at 16.) Mehtsentu seeks relief in the form of (1) an order setting aside or correcting his sentence, "restoring [him] to pre-pleading status for resentencing" or, in the alternative, (2) an order setting the matter for an evidentiary hearing. (*Id.* at 17.)

The government opposes the motion on the grounds that it is factually inaccurate, fails to show that counsel's performance was constitutionally deficient, and fails to allege that Mehtsentu

was actually prejudiced by any purported deficiency. The government also asserts that Mehtsentu has failed to establish that he is entitled to an evidentiary hearing.

## II.    STANDARD OF REVIEW

Under § 2255, a federal prisoner may move to vacate, set aside, or correct his judgment of conviction and sentence if he claims that the sentence was imposed in violation of the Constitution or laws of the United States, that the court lacked jurisdiction to impose the sentence, or that the sentence is in excess of the maximum authorized by law or is otherwise subject to collateral attack. 28 U.S.C. § 2255(a).

Claims of ineffective assistance of counsel are cognizable under § 2255. *Gilbert v. United States*, 64 F.4th 763, 770 (6th Cir. 2023) (citing *Massaro v. United States*, 538 U.S. 500, 504, 508–09 (2003)). And "the Sixth Amendment's requirement that defendants receive the effective assistance of competent counsel extends to all critical stages of a criminal proceeding, including plea negotiations." *Id.* (quoting *Byrd v. Skipper*, 940 F.3d 248, 255 (6th Cir. 2019) (internal quotation marks omitted).

To establish the ineffective assistance of counsel, a defendant generally must show both deficient performance and prejudice resulting from that deficiency. *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009); *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Gilbert*, 64 F.4th at 771. To establish deficient performance, the defendant must "show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. To do so, he "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. To prove prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Although defendants have no constitutional right to a plea offer, it is well established that, once the government chooses to enter into plea negotiations, defendants are entitled to the effective assistance of counsel in "navigating that crucial process." *Gilbert*, 64 F.4th at 771 (quoting *Rodriguez-Penton v. United States*, 905 F.3d 481, 489 (6th Cir. 2018)). This includes providing "accurate advice regarding sentence exposure." *Id.*; *see also Smith v. United States*, 348 F.3d 545, 553 (6th Cir. 2003) ("[I]n the context of the modern criminal justice system, which is driven largely by the Sentencing Guidelines, more [than merely conveying a plea offer] is required. A criminal defendant has a right to expect at least that his attorney will review the charges with him by explaining the elements necessary for the government to secure a conviction, discuss the evidence as it bears on those elements, and explain the sentencing exposure the defendant will face as a consequence of exercising each of the options available.).

Generally speaking, in the context of a plea agreement, "prejudice may lie where a petitioner demonstrates that counsel's deficient performance infected his decisionmaking process, and thus undermine[d] confidence in the outcome of the plea process." *Rodriguez-Penton*, 905 F.3d at 488. "A defendant is not limited to showing he would have gone to trial but for the bad advice during the plea process." *Gilbert*, 64 F.4th at 771 (citing *Rodriguez-Penton*, 905 F.3d at 487–88). "He 'may demonstrate prejudice if he can show that, had he known about the risk of adverse . . . consequences, he would have bargained for a more favorable plea.'" *Id.* (quoting *Rodriguez-Penton*, 905 F.3d at 488).

## III. WHEN A HEARING IS REQUIRED

A prisoner who files a motion under § 2255 challenging a federal conviction is generally entitled to "a prompt hearing," at which the district court is to "determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255. The hearing is mandatory, "unless 'the motion and the files and records of the case conclusively show that the

prisoner is entitled to no relief.'" *Fontaine v. United States*, 411 U.S. 213, 215 (1973) (quoting 28 U.S.C. § 2255(b)). "If the record includes a factual dispute, the district court must hold a hearing to determine the truth of the [movant's] claims." *Ross v. United States*, 339 F.3d 483, 490 (6th Cir. 2003) (quotation marks and citation omitted). However, "no hearing is required if the petitioner's allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Valentine v. United States*, 488 F.3d 325, 333 (6th Cir. 2007) (quoting *Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999)).

## IV.    DISCUSSION

### A.    Failure to Ensure Plea Was Knowing and Voluntary

Guilty pleas "not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970). "The longstanding test for determining the validity of a guilty plea is 'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" *Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)). "Where, as here, a defendant is represented by counsel during the plea process and enters his plea upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice 'was within the range of competence demanded of attorneys in criminal cases.'" *Id.* (quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970)). A defendant who pleads guilty upon the advice of counsel "may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel" was outside that range. *Id.* at 56–57. He must also establish prejudice, that is, that "counsel's constitutionally ineffective performance affected the outcome of the plea process." *Id.* at 59; *accord Lafler v. Cooper*, 566 U.S.156, 163 (2012).

1. *Failure to Provide Discovery*

The court understands Mehtsentu to be claiming that his plea was not knowing and voluntary, in part, because his attorney "failed to provide Mehtsentu with the government's discovery." (Doc. No. 2, at 9; *see also* Doc. No. 2-1, May 7, 2021 Affidavit of Filmon Mehtsentu ("Mehtsentu Aff.") ("[M]y lawyer David I. Komisar did not provide me with all of my discover[y].").) According to Mehtsentu, his attorney explained that the discovery was too much to put on paper and kept promising to bring a laptop computer or a flash drive so he could view digital copies, but he never did, so Mehtsentu never viewed all of the discovery. (Mehtsentu Aff. 1.)

David Komisar contradicts this assertion in his Affidavit, in which he states that, while he did not provide his client with "a copy of all discovery," as most of the discovery was in the form of wiretap recordings, he did "bring the discovery to the various jails where Mr. Mehtsentu was located," and they listened to all of the wiretap recordings together.[4] (Komisar Aff. ¶ 1.) In addition, Mehtsentu's Affidavit is directly contradicted by Mehtsentu's Plea Petition, which Mehtsentu signed in open court under penalty of perjury and in which he attested: "My lawyer has . . . reviewed with me the discovery material provided by the Government. I am satisfied with his representation at this point." (Doc. No. 522, Plea Petition ¶ 11.) At the change of plea hearing, Mehtsentu swore under oath that he had read the Plea Petition and the Plea Agreement and felt that he understood both of them, that his attorney had done all the investigation he had asked, and that he was satisfied with his attorney's representation to that point. (Crim. Doc. No. 777, at 9.)

---

[4] It must also be noted that, during the sentencing hearing, the court learned that Mehtsentu had proffered three times, during which he explained wiretap conversations "as they listened going through all these line sheets." (Crim. Doc. No. 778, at 38.) It thus appears that Mehtsentu had many opportunities to go through the discovery he claims not to have seen.

Mehtsentu also listened to the prosecutor's detailed summary of the evidence against him, specifically referencing the wiretaps on four telephones used by Mehtsentu, and confirmed that the government had "accurately inform[ed] the court of [his] role" in the conspiracy. (*Id.* at 25.)

"A defendant's solemn declarations in open court affirming a plea agreement . . . 'carry a strong presumption of verity,' because courts must be able to rely on the defendant's statements made under oath during a properly conducted Rule 11 plea colloquy." *United States v. Lemaster*, 403 F.3d 216, 221 (4th Cir. 2005) (quoting *Blackledge v. Allison*, 431 U.S. 63, 74 (1977)) (additional citations and alterations omitted). The petitioner's Affidavit directly contradicts the sworn statement in the Plea Petition and his statements at the change of plea hearing, and the court finds it implausible, to say the least, that counsel did not go over discovery—specifically the wiretap recordings—with his client.

More to the point, even assuming counsel failed to do so and that this failure was objectively unreasonable, Mehtsentu has not established prejudice arising from this purported failure. He has not argued that he was surprised by the government's summary of the evidence, that it was untrue or unsupported, or that he had not been apprised of any of it prior to the change of plea hearing. He has not identified any specific item of discovery that, had it been shown or disclosed to him before he entered his plea, would have caused him either not to plead guilty or would have placed him in a better bargaining position such that a lesser sentence would have been warranted.[5] He has not presented any reason to believe that his attorney's purported failure to show him any discovery item "infected his decisionmaking process, and thus undermine[d] confidence in the outcome of the plea process." *Rodriguez-Penton*, 905 F.3d at 488.

---

[5] Transcripts of most, if not all, of the recorded calls, were placed in the record by the government prior to sentencing, along with a compact disc containing copies of the actual recordings. (*See* Crim. Doc. Nos. 715-1 through -9, 716.)

The court finds, in short, that Mehtsentu's effort to create a factual dispute by executing an Affidavit that conflicts with his sworn statements in court and in his Plea Petition does not entitle him to an evidentiary hearing, first, because the statement in his Affidavit is inherently incredible; and, second, even if it were true, Mehtsentu has not alleged or established any form of prejudice arising from his inability to view any particular item of discovery prior to entering his guilty plea.

      2.     *Failure to Ensure Mehtsentu Understood Change of Plea Hearing*

Mehtsentu states in his Affidavit, "I told the judge at my plea agreement [sic] that I did not understand the things going on and that I was confused. After I left the courtroom my lawyer, Mr. Komisar, told me not to do that again, that I wouldn't get the deal if I did that, that I needed to say I understood everything." (Mehtsentu Aff. 4–5.) Komisar flatly denies ever telling Mehtsentu not to tell the court he did not understand what was being said in court. (Komisar Aff. ¶ 5.) The court finds that this discrepancy does not require an evidentiary hearing and that Mehtsentu cannot establish ineffective assistance of counsel based on this claim.

As discussed above, the transcript of the change of plea hearing reflects that the court asked Mehtsentu if he was on any medication, whether he had taken any narcotics, hallucinogens, or medicine containing narcotics within the preceding 12 hours, and whether his mind was clear. Mehtsentu denied taking any drugs or medication but informed the court that his "mind hadn't been clear." (Crim. Doc. No. 777, at 15.) The court delved further, and Komisar explained that Mehtsentu had indicated to him that he felt he might need some mental health counseling, because "obviously facing at least a mandatory minimum sentence of 20 years has put a lot of stress on him." (*Id.* at 16.) According to Komisar, Mehtsentu was losing his concept of the passage of time, but this had "nothing to do with intellect. He thoroughly understands what's going on here, but he . . . wants some mental health counseling at the appropriate time." (*Id.*) Mehtsentu affirmed that his attorney had "explained that correctly." (*Id.*) In light of this disclosure, the court directed

counsel to file a motion for a mental health evaluation, which he subsequently did (Crim. Doc. No. 525), and the court granted it (Crim. Doc. No. 527). This evaluation took place and was taken into consideration at sentencing. (*See* Crim. Doc. No. 778, at 55–56.)

In any event, during the change of plea hearing, after Mehtsentu disclosed to the court that his mind was not really clear, the court questioned him closely to ensure that he understood that he was pleading guilty, understood the mandatory minimum sentence he faced as a result, and understood that the government was not going to file a motion saying that he had cooperated enough to go below the mandatory minimum—having Mehtsentu state in his own words his understanding of what was going on, rather than simply answering yes or no to questions posed to him:

THE COURT: You tell me what you're doing today.

THE DEFENDANT: Pleading guilty.

THE COURT: Pleading guilty. And what is the minimum sentence you can receive? What's the smallest sentence you can receive?

THE DEFENDANT: Like 20. 20.

THE COURT: 20 what?

THE DEFENDANT: 20 years.

THE COURT: 20 years. You understand that?

THE DEFENDANT: Yes, ma'am.

(*See* Doc. No. 777, at 16–17.) "A defendant's statements on the record during a plea colloquy that he or she understands the nature and the consequences of the plea provide strong evidence that a plea was intelligent and knowing." *Boyd v. Yukins*, 99 F. App'x 699, 703 (6th Cir. 2004); *see also Blackledge v. Allison*, 431 U.S. 63, 74 (1977) ("Solemn declarations in open court" that a plea was voluntary, knowing, and intelligent "carry a strong presumption of verity.").

The court also inquired whether Mehtsentu wanted additional time to think about whether he wanted to plead guilty. Mehtsentu declined and affirmatively stated that he was certain he wanted to plead guilty. (Crim. Doc. No. 777, at 17.) The court nonetheless declined to accept the plea that day, specifically so that Mehtsentu would "be able to more easily withdraw his guilty plea" if something came up during the mental health evaluation that "causes some concern." (Crim. Doc. No. 777, at 19.) Although the evaluation was performed, nothing of concern that would affect the validity of the plea was raised in the report. (*See* Crim. Doc. No. 778, at 55–56.) Moreover, the court observed Mehtsentu's appearance at the change of plea hearing and his responsiveness to the questions asked and was satisfied that Mehtsentu was in "full possession of his faculties and competent to plead guilty." (Crim. Doc. No. 777, at 26.) The court was—and remains—fully persuaded that Mehtsentu understood what was going on, understood the Plea Agreement, and voluntarily offered to plead guilty. (*Id.*)

In sum, the record affirmatively reflects that Mehtsentu understood what was happening at the change of plea hearing, understood the mandatory minimum sentence in place at that time for the charge to which he was pleading guilty, and confirmed that he wanted to proceed with pleading guilty, because he was, in fact, guilty. (*See id.* at 25.) Mehtsentu's statement that his counsel was ineffective for not failing to ensure that he understood the proceeding is therefore not credible, and he has failed to show that his counsel's performance fell below an objective standard of reasonableness. Moreover, Mehtsentu has not indicated what, exactly, he did not understand or how the outcome of the proceeding would have been different if he had understood things differently. Thus, he has not established prejudice arising from his vague assertion that counsel failed to ensure that his plea was entered knowingly and intelligently. Relief on the basis of this claim will be denied.

### 3. *Failure to Explain Charges and Potential Sentence Prior to Plea*

Mehtsentu claims that his attorney "improperly advis[ed] [him] regarding the charges and potential sentence against him." (Doc. No. 2, at 4–5.) This claim is closely related to the claim discussed above that his plea was not knowing and voluntary and is likewise without merit.

The court finds that Mehtsentu's claim that he did not understand the charges or potential sentence prior to pleading guilty is not supported by the record. First, at the change of plea hearing, Mehtsentu confirmed under oath that he had read and understood the Plea Petition and Plea Agreement, and these documents set out the charges against Mehtsentu and the potential sentence.[6] (Crim. Doc. No. 777, at 9.) By signing these documents, Mehtsentu confirmed under oath that he had gone over the Second Superseding Indictment with his attorney and understood the accusations made against him and the possible sentence to which he was exposed—including a mandatory minimum sentence of 20 years and an estimated guideline range of 360 months to life. (Crim. Doc. No. 552, Plea Petition ¶¶ 3–6; Plea Agreement ¶¶ 1–4.) It was clear during the change of plea hearing that Mehtsentu's counsel had gone over this information with his client prior to the hearing, and Mehtsentu's contrary claim now is not credible.

Second, even though Mehtsentu professed to having read and understood the charges against him, the court went over the charge set forth in the Second Superseding Indictment, the mandatory minimum sentence of 20 years, and the parties' joint recommended final offense level of 39, for guideline calculation purposes. (Crim. Doc. No. 777, at 4–5, 6, 10, 12.) Consequently, even if counsel had failed to make it clear prior to the change of plea hearing the charges and potential sentence Mehtsentu faced, the plea colloquy conducted by the court ensured that

---

[6] The PSR states that Mehtsentu dropped out of school before completing the 11th grade but had earned his GED. (Crim. Doc. No. 756, at 24.)

Mehtsentu, indeed, understood the charge against him and the potential sentence at the time he entered his plea. As a result, even if counsel's performance had been deficient, Mehtsentu has not established how he was prejudiced or that he lacked any information pertinent to his decision at the time he entered his plea.

Mehtsentu, again, has not demonstrated that counsel's representation was deficient or that his purportedly deficient performance "infected [Mehtsentu's] decisionmaking process, and thus undermine[d] confidence in the outcome of the plea process." *Rodriguez-Penton*, 905 F.3d at 488. The plea was knowing and voluntary, and Mehtsentu's attempt to establish a factual dispute through his Affidavit is unavailing.

### B.    Ineffective Assistance at Sentencing

#### 1.    Failure to Properly Explain PSR and Sentencing Exposure Prior

Mehtsentu claims that his attorney fail[ed] to inform him of the "sentencing levels and the findings and effect of his presentence report." (Doc. No. 2, at 9.) Mehtsentu claims in his Affidavit that Komisar first told him he faced a 20-year mandatory minimum; after the First Step Act passed, he was told it was 15 years; and then, two weeks before his sentencing, he was told it was 10 years, which confused him. (Mehtsentu Aff. 5.) He then claims that, after his co-defendant Guled Mohammed was sentenced to 151 months but before his own sentencing, counsel promised him that he would get "no more than the 10 years." (*Id.*) Komisar purportedly repeated this promise during the sentencing hearing. (*Id.* at 5–6.) But, after the prosecutor told the judge "lies about [his] having charges in Atlanta that [he] never had," things changed. (*Id.* at 6.) Even after sentencing, according to Mehtsentu, his attorney told him he was "not suppose[d] to have gotten more than 120 months." (*Id.*)

Komisar's Affidavit disputes many of the petitioner's allegations. According to Komisar, he informed Mehtsentu from the beginning that he was facing a potential mandatory life sentence

due to his "multiple prior drug convictions." (Komisar Aff. ¶ 2.) He also asserts that he spent more than two hours reviewing the PSR with Mehtsentu in May 2019, prior to the sentencing hearing. (*Id.* ¶ 3.) He affirms that, to this day, he believes that Mehtsentu should have received a lesser sentence, given that Mohammed, the leader of the conspiracy, received only 151 months, but he never promised Mehtsentu that he would, or even could, get a 10-year sentence. (*Id.* ¶ 3.) Rather, as the record indeed reflects, Komisar asked the court for a 12-year sentence for his client. (*See* Crim. Doc. No. 778, at 38, 56.) He states that he hoped for no more than 15 years and was disappointed when the court sentenced Mehtsentu to 240 months instead. (Komisar Aff. ¶¶ 4. 7.)

Komisar acknowledges that the case took a "strange turn" when the First Step Act was passed, reducing the mandatory minimum. (*Id.* ¶ 6.) Komisar believed that this would have been a viable basis for withdrawing the plea, but, after the government withdrew the 851 enhancement, meaning that Mehtsentu faced a 10-year mandatory minimum, and, despite the guideline range of 360 months to life, facing that risk "seemed better to [him] than withdrawing the plea and [risking] the Government filing two 851 notices to get to [a minimum of] 25 years." (*Id.*) In Komisar's view, "[t]his was not a triable case" (*id.*). in light of the evidence of Mehtsentu's guilt.

The court finds Mehtsentu's assertion that his attorney assured him that he would not receive more than 120 months inherently not credible and contradicted by the record, particularly the facts that counsel asked for 144 months at the sentencing hearing and that both Komisar and Mehtsentu knew that the guideline range at the time of sentencing remained 360 months to life, even after passage of the First Step Act, due to Mehtsentu's criminal history. Moreover, as set forth above, Mehtsentu knew at the time he entered his plea of guilty that he faced a 20-year mandatory minimum and a potential life sentence as a result of the sentencing guideline range. He swore under oath in open court at the change of plea hearing that no one had "promised or

suggested to [him] what sentence [the court would] give [him] in order to get [him] to plead guilty." (Crim. Doc. No. 777, at 15.)

In addition, Mehtsentu does not contend that he sought to withdraw his plea after the First Step Act passed, nor does he claim even now that he would have withdrawn his plea if he had known that he would receive a sentence of more than ten years. Thus, it is entirely unclear to the court in what way Mehtsentu claims to have been prejudiced by his attorney's deficient performance in allegedly promising him an unrealistically low sentence. Again, as with the claims that pertain more directly to the voluntariness of his plea, Mehtsentu does not assert that counsel's purportedly deficient performance impacted his decision to plead guilty. Rather, he seems to believe that his attorney's performance was unreasonable because Mehtsentu was "left with an enhanced sentence and no avenue for appeal" (Doc. No. 2, at 13)—that is, that his attorney's failures caused him to receive a greater sentence than he should have. As discussed below, however, counsel's performance did not lead to an enhanced sentence.

## 2. *Failure to Object to PSR Findings and Sentencing Enhancements*

The heart of Mehtsentu's ineffective-assistance claim seems to be that his attorney's failure to object to sentencing enhancements included in the PSR resulted in his receiving a longer sentence than he otherwise would have, and he was prejudiced by his entry of the plea, because his plea agreement waived his ability to appeal his sentence. "[A]n attorney's failure to object to an error in the PSR's calculation of the guidelines—if left uncorrected by the district court—can be grounds for finding deficient performance." *Howard v. United States*, 743 F.3d 459, 464 (6th Cir. 2014). Specifically, Mehtsentu claims that his attorney was deficient for failing to object to the enhancements for his having a leadership role in the criminal enterprise, threat of violence, gun charges, and the amount of drugs charged against him. (Doc. No. 2, at 9.) He also argues that Komisar advised him to cooperate with the government and repeatedly told him it would be to his

benefit to do so, but then he "refused" to "press the [safety-valve] issue." (*Id.* at 13.) Again, Mehtsentu cannot establish either deficient performance or prejudice.

Because Mehtsentu clearly did not qualify for the "safety valve" under 18 U.S.C. § 3553(f) or U.S.S.G. § 5C1.2, the court interprets this argument to be that Komisar refused to argue forcibly that he should have received a 5K motion for his cooperation, which would have removed the mandatory minimum sentence. Of course, the 20-year mandatory minimum had been reduced to 10 years as a result of the First Step Act. Nonetheless, the record reflects that counsel for Mehtsentu argued vigorously at the sentencing hearing that Mehtsentu had cooperated with the government and should be entitled to a sentence reduction for cooperation. (*See* Crim. Doc. No. 778, at 38–39.) Mehtsentu and his counsel both confirmed at the change of plea hearing their understanding that, if the government did not file the requisite motion, the court would not be able to issue a sentence below the mandatory minimum, though it could use its discretion to give him some credit for his cooperation. (*See* Crim. Doc. No. 777, at 11, 17.) At sentencing, the court chose not to sentence Mehtsentu to the mandatory minimum and would not, in any case, have sentenced him to less than the 10-year mandatory minimum, though the court did accord him "some credit for his cooperation" at sentencing. (Crim. Doc. No. 778, at 59.) Mehtsentu cannot establish either deficient performance or prejudice resulting from his counsel's alleged failure to seek a 5K motion or argue that he was entitled to a sentence reduction below the mandatory minimum.

Regarding the other issues, Mehtsentu appears to claim that he was surprised at the sentencing hearing by the enhancements in the PSR. (*See* Doc. No. 2, at 10 ("Due to trial counsel's deficient performance, Mehtsentu met substantial surprises at sentencing.").) As the transcript for the change of plea hearing reflects, however, the court discussed with Mehtsentu then that, under the Plea Agreement, the parties had agreed that, pursuant to the applicable Sentencing Guidelines,

he was subject to a two-point enhancement for possession of a firearm during the drug conspiracy, another two-point enhancement for having made a credible threat of violence, and a four-point enhancement for his having been an organizer or leader of a criminal activity involving five or more participants. (Crim. Doc. No. 777, at 10, 12.) None of these, therefore, could have come as a surprise.

At the sentencing hearing, counsel for Mehtsentu, in fact, did raise objections to most of these enhancements (*see* Crim. Doc. No. 723), and the court addressed them, while noting that "none of them ha[d] any effect on the sentencing range" (Crim. Doc. No. 778, at 3). Mehtsentu's counsel objected that the record reflected that Mehtsentu's threat of violence was not actually credible, as he had continued to work cordially with his co-conspirator after the "non-credible threat." (Crim. Doc. No. 723 ¶ 2.) Aside from the fact that Mehtsentu had agreed to this enhancement, the government's sworn recitation of the factual basis for the plea during the change of plea hearing included reference to a "series of calls" made by Mehtsentu, "indicating that he was planning to harm" one of his co-conspirators (Crim. Doc. No. 777, at 24). Accordingly, the court overruled that objection. (Crim. Doc. No. 778, at 3–4.) Counsel's performance was not objectively unreasonable.

Counsel for Mehtsentu also objected to a three-point enhancement in paragraph 43 of the PSR based on a prior conviction, specifically arguing that the sentence for the prior offense noted in paragraph 43 had been reduced to time served, such that it was impossible to tell from the report whether Mehtsentu had "served more than one year and one day." (Crim. Doc. No. 723 ¶ 3 (citing U.S.S.G. § 4A1.1(a)).) The court overruled this objection, finding that "the probation office is correct in their response to this. The first count of that offense carried a two-year sentence. And under 4A1.2(a), which [defines] prior sentence, it is the sentence imposed, not the sentence

served," that drives the enhancement. (Crim. Doc. No. 778, at 4.) Again, counsel's performance was not objectively unreasonable.

Counsel for Mehtsentu objected to a two-point enhancement for commission of the subject crime while on parole as stated in PSR ¶ 47. (Crim. Doc. No. 723 ¶ 4.) The court noted that this enhancement had been removed from the PSR Supplement dated July 10, 2019, leaving the defendant with 16 criminal history points instead of 18, but Mehtsentu nonetheless "remain[ed] in Criminal History Category VI." (Crim. Doc. No. 778, at 4.) Again, no deficient performance.

Regarding the enhancement for a leadership role, while the parties agreed as part of the Plea Agreement that Mehtsentu had a leadership role in the criminal conspiracy and Mehtsentu's attorney did not raise an objection to the sentencing enhancement related to that role, the failure to do so was not constitutionally deficient performance. And if he had raised such an objection, the court would have overruled it. The government's proffer of evidence, including the wiretap recordings and transcripts, conclusively established that Mehtsentu filled a leadership role in the enterprise, even if he was not the only leader. Insofar as he seeks to compare himself to his co-defendant Guled Mohammed for sentencing purposes, as also noted on the record, Mohammed's base offense level and Criminal History Category were both significantly lower than Mehtsentu's, and the low end of Mohammed's guideline range was 151 months. (Crim. Doc. No. 778, at 41, 57.) The fact that Mohammed had an arguably greater leadership role in the conspiracy but nonetheless received a lesser sentence does not establish that Mehtsentu's counsel was ineffective for failing to obtain a similar sentence for his client. Counsel certainly endeavored at sentencing to compare Mehtsentu with Mohammed and vigorously argued that Mehtsentu should receive a sentence comparable to Mohammed's. (*Id.* at 37–40.)

Finally, Mehtsentu argues that his attorney's conduct was deficient because, "despite glaring error, trial counsel failed to object to the amount of drugs charged against Mehtsentu." (Doc. No. 2, at 9.) Mehtsentu does not identify any such "glaring error," and the court finds none. The Second Superseding Indictment specifically attributed to Mehtsentu responsibility for conspiring to distribute one kilogram or more of a mixture or substance containing a detectable amount of heroin; 400 grams or more of a mixture or substance containing fentanyl; and 500 grams or more of a mixture or substance containing methamphetamine. (Crim. Doc. No. 405, at 2.) The Plea Agreement and Plea Petition included reference to these specific quantities, and Mehtsentu voluntarily pleaded guilty to the charge involving these quantities. (Crim. Doc. No. 522, Plea Petition ¶ 12; Plea Agreement ¶ 3.) At the change of plea hearing, the court specifically notified Mehtsentu that these were the quantities for which he was being held responsible, and Mehtsentu voiced both his understanding of the charge and the quantities for which he was being held responsible and his willingness to plead guilty to the offense as charged. (Crim. Doc. No. 777, at 4–5, 9, 25–26.) Finally, the government's summary of the evidence established his responsibility for these quantities. (*See, e.g.*, *id.* at 21–23.) While it is true that counsel for Mehtsentu did not object to the amount of drugs for which Mehtsentu was held responsible, Mehtsentu clearly understood the charge against him, well before sentencing, and he accepted responsibility for the quantities charged, confirming in open court his role in the conspiracy as summarized by the government and his understanding that the government would be able to prove beyond a reasonable doubt the crime for which he was charged—including the specific quantities of drugs at issue. Mehtsentu, in short, has not presented any facts that, if true, would establish that his counsel was objectively unreasonable in failing to object to the drug amounts charged in the Second Superseding Indictment and for which Mehtsentu accepted responsibility by pleading

guilty; nor has Mehtsentu established prejudice arising from any such allegedly deficient performance.

It is clear to the court that counsel's performance did not result in unwarranted sentencing enhancements and that his recommendation that his client cooperate, in fact, contributed significantly to the court's decision to sentence Mehtsentu below the advisory guideline range. Mehtsentu has not established that his counsel's performance was objectively unreasonable at any stage of the proceedings or that Mehtsentu was prejudiced by any purported deficiency in his representation.

### C.      Abandonment

In a last-ditch effort to salvage his claim, Mehtsentu argues in the alternative that his counsel's performance was so glaringly deficient that he was effectively abandoned by his counsel and thus deprived of the benefit of having an attorney at all at the plea and sentencing stages of the proceedings against him, such that he is not required to establish prejudice arising from counsel's errors. (*See* Doc. No. 2, at 16.)

The Supreme Court and Sixth Circuit have recognized that the *Strickland* standard may be inapplicable, and prejudice presumed, "where the circumstances arising in a criminal prosecution are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *United States v. Coleman*, 835 F.3d 606, 612 (6th Cir. 2016) (citing *United States v. Cronic*, 466 U.S. 648, 659 (1984)) (internal quotation marks and other citations omitted). The circumstances under which prejudice may be presumed are rare and narrowly defined, however. The Supreme Court has recognized only three situations giving rise to a presumption of prejudice:

> First, courts must presume prejudice where there has been a "complete denial of counsel" at a "critical stage" of the criminal proceedings. Second, we also presume prejudice "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." Third, even if counsel is present and available to assist the

accused, a prejudice inquiry is unnecessary where "the likelihood that any lawyer, even a fully competent one, could provide effective assistance" is minimal.

*Id.* 612 (quoting *Cronic*, 466 U.S. at 659–60); *see also Penson v. Ohio*, 488 U.S. 75, 88–89 (1988) (where the petitioner was completely deprived of counsel on appeal, prejudice will be presumed); *Pirkel v. Burton*, 970 F.3d 684, 697 (6th Cir. 2020) ("[W]e presume prejudice because Pirkel was effectively denied counsel on appeal.").

Mehtsentu does not identify which of the three circumstances he contends exists in this case, but it appears that he means to rely on the second, as he argues that the court "should find that the gravity of counsel's deficient performance in this case amounts to a deprivation of counsel altogether, giving rise to a presumption of prejudice." (Doc. No. 2, at 16.) The court is not persuaded. The Supreme Court has explained that, in order for "the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case" to arise, "the attorney's failure must be complete." *Bell v. Cone*, 535 U.S. 685, 697 (2002) (emphasis added). That is, counsel must "entirely fail[] to subject the prosecution's case to meaningful adversarial testing." *Id.* (quoting *Cronic*, 466 U.S. at 659). That did not happen in this case. Mehtsentu may not have received the sentence he wanted, but that fact is attributable to his own conduct and not to any failure on the part of his attorney, who argued vigorously on his behalf and did not, by any stretch of the imagination, abandon his client at any critical stage of the criminal proceedings.

## V.    CERTIFICATE OF APPEALABILITY

Under Rule 11 of the Rules Governing Section 2255 Proceedings, "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A certificate may issue only if a movant "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Supreme Court has explained that, when the district court rejects a movant's constitutional claims on the merits, the movant "must demonstrate

that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (addressing issuance of a certificate of appealability in the context of a habeas petition filed under 28 U.S.C. § 2254).

In this case, reasonable jurists would not debate the denial of Mehtsentu's § 2255 Motion or conclude that "the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Accordingly, the court will not issue a certificate of appealability.

## VI.    CONCLUSION

The court finds that Mehtsentu has not established that an evidentiary hearing is required. Nor has he shown that his attorney's performance was constitutionally deficient or that he was in any way prejudiced by his attorney's purported errors. He is not entitled to relief on the basis of the claims asserted in his § 2255 motion. Accordingly, the court will a deny Mehtsentu's motion and dismiss this case, without a hearing and without issuing a certificate of appealability.

An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge